**GRINNELL CORPORATION**

**v.**

**Mary C. HACKETT, Director of the Department of Employment Security of the State of Rhode Island and John J. Affleck, Director of the Department of Social and Rehabilitative Services of Rhode Island.**

**Civ. A. No. 4926.**

United States District Court,
D. Rhode Island.

June 15, 1972.

**750**

George M. Vetter, Jr., William R. Powers, III, Providence, R. I., David D. McKeeney, Barrington, R. I., for plaintiff.

W. Slater Allen, Jr., Asst. Atty. Gen., R. I., Providence, R. I., Charles H. McLaughlin, Providence, R. I., for Hackett.

Louis B. Rubinstein, Dept. Employment Security, Providence, R. I., for Hackett.

## OPINION

PETTINE, Chief Judge.

Plaintiff, the Grinnell Corporation, seeks a preliminary injunction restraining defendants from paying unemployment benefits and public assistance to Grinnell's striking employees. Plaintiff argues that such payments substantially frustrate the policies of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 141 et seq., and intrude into an area preempted by that act. Moving to convene a three-judge court pursuant to 28 U.S.C. § 2281, plaintiff argues that G.L.R.I. (1956) § 28–44–1 et seq., which authorizes otherwise eligible persons to receive unemployment benefits if on strike, is unconstitutional under the Supremacy Clause.

The United Steelworkers of America, AFL–CIO, the union representative of the striking workers, and the Chamber of Commerce of the United States and the Greater Providence Chamber of Commerce have been allowed to intervene.

The matter in controversy is alleged to exceed $10,000. Jurisdiction is not contested and this Court finds jurisdiction to have been established.

Defendants have moved to dismiss the action on Rule 12(b) (6), Fed.R.Civ.P., grounds and on grounds of stare decisis, citing ITT Lamp Division of International T. & T. Corp. v. Minter, 435 F.2d 989 (1st Cir. 1970), cert. den. 402 U.S. 933, 91 S.Ct. 1526, 28 L.Ed.2d 868.

█ A three-judge court is not required where a state statute is attacked under the Supremacy Clause as being in conflict with a federal statute. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). Accordingly, the motion for a three-judge court was denied. This Court held a hearing on preliminary injunction.

*Findings of Fact*

Unemployed persons otherwise eligible under Rhode Island law may receive unemployment compensation benefits after a one-week waiting period. R.I.G.L. § 28–44–14. A person who becomes unemployed because of participation in a strike and who is otherwise eligible must wait an additional six weeks to be entitled to benefits. R.I.G.L. § 28–44–16.

Following expiration of their collective bargaining agreement and of several months of negotiations, the 585 employees of the plaintiff, Grinnell Corporation at the Cranston, R. I., plant went out on strike on March 20, 1972. Some of the strikers have applied for and some receive forms of public aid, including Aid to Families with Dependent Children (AFDC), food stamps, and unemployment compensation. Mr. Joseph F. Murray of the Department of Social and Rehabilitative Services testified as to Grinnell employees receiving AFDC, food stamps, or General Relief. Eighty strikers applied for public assistance, some sixty-nine were found eligible, and sixteen of these receive aid. The remainder of the sixty-nine do not get welfare because they receive unemployment compensation which lifts them above the standard of need. No striker

received both unemployment compensation and welfare at the same time. Of the one hundred thirty seven strikers originally eligible for food stamps, only sixteen remained eligible and received stamps as of the time of the hearing. The average family benefit for the striking employees amounts to $280 per month.

The parties have stipulated that for the week ending May 13, 1972, four hundred and four of plaintiff's striking employees received a total of $31,190 in unemployment compensation, of which $29,425 was the benefit rate payable to all of the four hundred and four employees and $1,765 was the dependents' allowance payable to one hundred seventy three of these employees. The average benefit received by the striking employee who received unemployment compensation for that week was $77.20.

The parties have further stipulated that on April 26, 1972 the striking employees rejected plaintiff's strike settlement offer despite recommendations of acceptance by the International Union representative and the negotiating committee.

*Conclusions of Law*

It is the meaning and application of ITT Lamp Division of International T. & T. Corp. v. Minter, 435 F.2d 989 (1st Cir. 1970), that comprises the central legal issue of this case. In *Minter* the First Circuit Court of Appeals affirmed the denial of a preliminary injunction against payment of welfare benefits to strikers on the ground that plaintiffs had not demonstrated probability of success on the merits. The Court found that the issue of irreparable harm merged into and became indistinguishable from the issue of probable success on the merits.

Noting that it was the first occasion on which a federal court had considered a confrontation between the national policy of free collective bargaining and state welfare laws, the *Minter* court found little in traditional "preemption" analysis to aid it. Distinguishing San Diego

Building Trades Council, etc. v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1958), the *Minter* court espoused a balancing process in which "both the degree of conflict and the relative importance of the federal and state interests are assessed," and stated:

"Where Congress has not clearly manifested its purpose to exclude state action which takes the form of exercise of its historic police powers, such state action will not be invalidated under the Supremacy Clause, 'in the absence of persuasive reasons', Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or unless the administration of state law 'palpably infringes' upon the federal policy. Southern Pac. Co. v. Arizona ex. rel. Sullivan, 325 U.S. 761, 766, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)". 435 F.2d at 992, 993.

Facing the problem of how to assess the extent of the conflict and the relative importance of the interests involved, *Minter* outlined elements of the requisite analysis:

"On neither count—the issue of extent of conflict or the relative strength of the federal and state interests— would we feel confident in any a priori judgment. A court would first have to determine the quantum of impact on collective bargaining stemming from the granting of welfare benefits to strikers. If this is found substantial a court would then have to weigh the impact on the state of declaring needy strikers and their families ineligible for welfare against the extent to which making them eligible stripped state government of its neutrality in a labor-management dispute.

Such weighing exercises could not be restricted to an ad hoc exploration of the microcosm of these particular disputes. A court must deal with 'classes of situations' and not 'judgments on the impact of * * * particular conflicts on the entire scheme of federal labor policy and administration', Garmon, supra, 359 U.S. at 242, 79

S.Ct. at 778. Under such an approach, a court would be interested in how many states permit strikers to receive welfare; whether or not strikes tend to be of longer duration where welfare is received; any studies of expert testimony evaluating the impact of eligibility for benefits on the strikers' resolve; a comparison between strike benefits and welfare benefits; the impact of the requirement that welfare recipients accept suitable employment; how many strikers actually do receive welfare benefits; and a host of other factors. In addition, the state's legitimate interests must also be considered: its interest in minimizing hardship to families of strikers who have no other resources than the weekly pay check, its concern in avoiding conditions that could lead to violence, its interest in forestalling economic stagnation in local communities, etc." 435 F.2d at 993.

Having catalogued these elements of proof, the Court went on:

"This very catalogue of data relevant to a macrocosmic weighing, which a court, if called upon would have to undertake, indicates the preferable forum to be the Congress. Congress would be particularly appropriate in resolving this issue. The activity allegedly intruding into federal labor policy is not solely a state activity but rather a joint state-federal program. Congress has established the minimal requirements with which participating state welfare plans must comply. 42 U.S.C. § 602, et seq. We do not attribute heavy weight to Congressional silence, but we would doubt that, if striker eligibility for welfare had a significant impact on labor-management relations, Congress would be unaware of that impact. Moreover, if the issue proves to be finely balanced, after weighing all the evidence, it may be a sufficient justification for upholding the state action that Congress is always free to provide specifically for preemption. See Penn Dairies v. Milk Control Comm., 318 U.S. 261, 275, 63 S.Ct. 617, 87 L.Ed. 748 (1943).

In sum, wholly apart from the inadequacy of the evidence before the district court, we have substantial doubt that a significant frustration of federal collective bargaining policy is effected by the granting of welfare benefits to indigent strikers or that, even so, the state interest is so insubstantial compared to the federal interest that Congress must be supposed to have deprived the state of such power to serve that interest. We accordingly hold that the district court did not err in concluding that plaintiffs' case did not have a sufficient probability of prevailing on the merits." 435 F.2d at 993–994 (emphasis added).

The controversy arises over the meaning of these two paragraphs. Defendants contend that the *Minter* court by its "catalogue" evidenced its belief that courts are not suited to the type of investigation this issue requires, and that the issue is more appropriately resolved by the Congress. The issue presented here, they argue, is not justiciable and this case should be dismissed. Further, they argue, introduction of evidence is foreclosed by *Minter's* "substantial doubt" that the state interest is so insubstantial that Congress must be supposed to have deprived the state of its power to serve that interest. They also argue that there has been no significant frustration of federal labor policy.

Plaintiff argues that *Minter* turned on the fact that virtually no evidence was introduced at trial in that case, and that *Minter* spelled out the sort of evidence necessary to show probability of success. Plaintiff here offers and has been allowed to introduce evidence of the sort catalogued in *Minter*. Plaintiff primarily relies on the testimony of two industrial researchers who have published a book, Welfare and Strikers: The Use of Public Funds to Support Strikers (1972). This evidence, plaintiff argues, proves that there has been substantial interference with federal collec-

tive bargaining policy because public aid has shifted the labor/management balance of power and has strengthened striker resolve. In any event, plaintiff claims, the instant case involves unemployment compensation and not welfare benefits and so is distinguishable from *Minter*.

This Court must disagree with plaintiff's contentions. For purposes of the issue at hand there is no distinctive difference between the Rhode Island statutory scheme providing unemployment compensation to strikers and the Massachusetts scheme providing welfare benefits. The Rhode Island legislature has declared its policy as to unemployment compensation:

"28–42–2. Declaration of policy.—Economic insecurity, due to unemployment, being a serious menace to the health, morale and general welfare of the people of this state is, therefore, a subject of interest and concern to the community as a whole, warranting appropriate action by the general assembly to prevent its spread and to lighten the burden which now falls on the unemployed worker and his family. According to the report of the joint special commission appointed pursuant to the joint resolutions, adopted respectively on February 5, 1935, March 4, 1935, and April 4, 1935, the evidence seems conclusive that in the face of recurring period of business depression, which industry and commerce appear powerless to prevent, the industrial worker's position is extremely insecure. The individual is as incapable of protecting himself against such unemployment, as industry is of preventing it. Experience has further shown that if the state delays action until unemployment becomes excessive, it can neither create promptly the organizations necessary to orderly, economical and effective relief, nor bear the financial burden of relief without disrupting its whole system of ordinary revenues and and jeopardizing its credit. Chapters 42 to 44, inclusive, of this title are designed to meet in some measure this situation by providing for the accumulation of a fund to assist in protecting the public against the ill effects of unemployment which may arise in future years."

As this Court ruled in Almacs, Inc. v. Hackett, 312 F.Supp. 964, 967–968 (D.R. I.1970):

"The Rhode Island unemployment compensation statute is part of a broad state-federal cooperative effort to protect citizens against economic vicissitudes. It was enacted at a time when there was both strong national and local feeling for the redress of certain economic evils which could eventuate from the unregulated play of market forces. Its operation has been consistent and continuing from 1936 to the present. That the federal government has shared in this operation is apparent from a reading of state and federal statutory law. § 28–44–1 et seq., G.L.R.I.1956, as amended, 26 U.S.C. §§ 3301–3309, 29 U.S.C. §§ 49–49K. In particular the statute's statement of purpose, § 28–42–2 G.L. R.I.1956, as amended, makes clear the general welfare nature of the statute. *It must, therefore, be concluded that it was neither the intent nor the primary purpose of the statute as a whole to impinge upon federally established collective bargaining rights.*" (Emphasis added.)

As to granting unemployment compensation to strikers, the Rhode Island legislature modified but hardly abandoned the salutory purpose behind its unemployment compensation scheme by imposing a penalty of a six-week waiting requirement. See Annese v. Board of Review of Dept. of Emp. Sec., 105 R.I. 32, 249 A.2d 46 (1969). It also appears that many of the Grinnell strikers would be receiving welfare were they not receiving unemployment compensation.

Unemployment compensation is, as is welfare, a joint federal-state undertaking, and as the *Minter* court noted, it is difficult to believe that if unemployment compensation had a significant deleteri-

754

ous effect on federal labor policy, Congress would be unaware of it. I take note of the defeat of recent proposals in Congress to forbid states from granting unemployment compensation to strikers.[1]

Also as the *Minter* court noted, the state interest involved here is a substantial one. As I ruled in *Almacs*, supra, 312 F.Supp. at 968:

"In the instant case the imposition upon collective bargaining power of the grant or denial of state benefits is speculative and limited. On the other hand, the concern of the state for the well-being of its unemployed and ultimately for the health of the local community is a most important interest 'deeply rooted in local feeling and responsibility.'"

In light of the strength of this interest, I share the substantial doubt of the *Minter* court that Congress has deprived the state of power to pursue this interest. One distinguished commentator has argued:

"[I]f the underlying rationale for federal preemption is the need for preserving the balance which Congress struck, some formula is required to measure the outer limits of congressional concern.

Here again it seems possible to arrive at an answer by asking what Congress was doing when it enacted the national labor laws. Congress obviously had its own views concerning the special rights and duties to be imposed upon employers, unions, and employees because of their relation to employee self-organization and free collective bargaining. Where further particularization would be appropriate, it delegated the function to a specially constituted administrative agency. But it is equally plain that Congress developed this special framework for self-organization and collective bargaining within a larger context of state law creating rights of property, bodily security, and personality, pre-

serving public order, and promoting public health and welfare." Cox, Labor Law Preemption Revised, 85 Harv.L.Rev. 1337, 1355 (1972)

And, as the *Minter* court found, the issue is one for decision by the Congress, not the Courts. See Comment, Welfare for Strikers: ITT v. Minter, 39 U.Chi.L. Rev. 79, 110 (1971).

 Bound by *Minter* I hold that the preliminary injunction must be denied on two grounds. First, the issue is appropriate for resolution by Congress, not by this Court. Second, Congress cannot be supposed to have denied the state the power to provide for its general welfare by providing unemployment compensation here. The state's interest is so substantial that this Court will not conclude that Congress has excluded such state action. For these reasons and on the basis of my holding in *Almacs*, supra, the motion to dismiss is granted. Because of the holding of this case I make no findings on the issue of infringement of the federal collective bargaining process. Defendants shall prepare an order accordingly.

---

[1]. See discussion in Comment, Welfare for Strikers: ITT v. Minter, 39 U.Chi.L.Rev. 79, 80 at n. 10 (1971).