**HAWAIIAN TELEPHONE COMPANY, a Hawaii Corporation, Plaintiff,**

**and**

**Hawaii Employers Council, Chamber of Commerce of the United States, and Chamber of Commerce of Hawaii, Intervenor-Plaintiffs,**

**v.**

**STATE OF HAWAII DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS et al., Defendants,**

**and**

**International Brotherhood of Electrical Workers, AFL–CIO Local 1357, et al., Intervenor-Defendants.**

**Civ. No. 74–140.**

United States District Court, D. Hawaii.

Oct. 14, 1975.

Declaratory Judgment and Order Nov. 17, 1975.

As Amended Feb. 9, 1976.

Jared H. Jossem, R. M. Torkildson, Torkildson, Katz & Conahan, Honolulu, Hawaii, for plaintiff and intervenor-plaintiff Hawaii Employers Council; Lawrence M. Cohen, Lederer, Fox & Grove, Chicago, Ill., for intervenor-plaintiff Hawaii Employers Council.

Edward Jaffe, Cades Schutte Fleming & Wright, Honolulu, Hawaii, and Gerard C. Smetana, Borovsky, Smetana, Ehrlich & Kronenberg, Washington, D.C., for intervenor-plaintiffs Chamber of Commerce of the U. S. and Chamber of Commerce of Hawaii.

Ronald Y. Amemiya, Atty. Gen., of Hawaii, Frank Yap, Jr., Deputy Atty. Gen., Honolulu, Hawaii, for defendants.

Edward H. Nakamura, James A. King, Bouslog & Symonds, Honolulu, Hawaii, for intervenor-defendant IBEW, Local 1357.

Benjamin C. Sigal, Shim, Sigal & Tam, Honolulu, Hawaii, for intervenor-defendant IBEW, Local 1260, and Hawaii State Federation of Labor.

## DECISION

PENCE, District Judge.

Plaintiff Hawaiian Telephone Company (TELCO) alleges that the potential payment of unemployment compensation to TELCO strikers by the State of Hawaii Department of Labor and Industrial Relations (DLIR) impermissibly infringes upon and interferes with TELCO's rights to engage in free collective bargaining, a field of activity preempted by Congressional regulation. This court granted a preliminary injunction against the DLIR in a previous decision on the same case. *See Hawaiian Telephone Company v. State of Hawaii*, 378 F. Supp. 791 (D.Haw.1974). The jurisdictional basis, applicable state law, prelim-

inary findings of fact [1] and legal analysis set forth in that decision are incorporated in this decision without repetition here.

Several union and employer organizations have intervened in this action.[2] The "hearing" mandated by *Super Tire Eng. Co. v. McCorkle*, 416 U.S. 115, 124, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) has been lengthy.

*Evidentiary Issues*

If the First Circuit's observation in *ITT Lamp Division of Int. Telephone & T. Corp. v. Minter*, 435 F.2d 989, 994–95 (1970),

> that welfare programs, supplying unmet subsistence needs to families without time limitation, address a more basic social need than does unemployment compensation, which attempts to cushion the shock of seasonal, cyclical, or technological unemployment by making available time limited benefits to individual workers, varying in relation to their prior earnings and without reference to demonstrated need

is accepted as true, then, as argued by plaintiffs, it would appear that The Court eliminated the need for a factual inquiry as to whether Hawaii's interpretation and implementation of its unemployment act affects the collective bargaining process, when The Court stated in *Super Tire*:

> The petitioners' claim is that [eligibility for public funds] affects the collective-bargaining relationship, both in the context of a live labor dispute when a collective-bargaining agreement is in process of formula-

tion, *and* in the ongoing collective relationship, so that the economic balance between labor and management, carefully formulated and preserved by Congress in the federal labor statutes, is altered by the State's beneficent policy toward strikers. It cannot be doubted that the availability of state welfare assistance for striking workers in New Jersey pervades every work stoppage, affects every collective-bargaining agreement, and is a factor lurking in the background of every incipient labor contract. (416 U.S. at 124, 94 S.Ct. at 1699)

Nevertheless, this court believed and therefore has ruled that an evidentiary hearing would be of assistance in the ultimate resolution of the problem before this court.

## FINDINGS OF FACT

*Expert Testimony*

Both plaintiffs and defendants proferred experts on the effect of the payment of unemployment compensation to strikers. For the plaintiffs, Glenn D. Meyers [3] in essence testified that employee decisionmaking with respect to negotiations and strikes is properly analyzed in cost-benefit terms. The employee compares what he expects to get in the way of settlement with his costs, primarily net lost wages due to striking, taking into account receipt of any outside funds. The defendants' expert conceded that money is a factor in determining behavior.[4]

Meyers examined the economic statistics of the TELCO dispute and determined that "the break-even point for the striker seeking an additional 1% in-

---

1. Most of this court's preliminary findings were subsequently stipulated by the parties. Pretrial Order, Oct. 1, 1974.

2. Local 1357, International Brotherhood of Electrical Workers, AFL–CIO, which represents employees of TELCO; Local 1260, IBEW, AFL–CIO, which represents employees at Hawaiian Electric Company; Hawaii State Federation of Labor, AFL–CIO; Hawaii Employers Council, an association

serving 650 employers in the field of industrial and labor relations; and the Chambers of Commerce of Hawaii and the United States.

3. Dr. Meyers is an economic consultant and teacher, specializing in labor economics. Trial transcript [Tr.] Oct. 2–3, at 1–3.

4. Tr. Dec. 10–17, at 587.

crease would be two weeks without [unemployment] benefits, and about five weeks if benefits are received." [5] His model assumed that the receipt of state benefits affects only the worker's perception of *cost*.

The primary thesis of Stanley H. Ruttenberg, defendants' expert,[6] was that if unemployment compensation were a significant factor in collective bargaining, it would influence wages to be higher or strikes to be longer in those states which provide benefits than in those which do not. If statistics demonstrate the contrary, they prove that unemployment insurance is not a significant factor.[7]

The data upon which Ruttenberg based his hypothesis was founded primarily upon the strike experience in Rhode Island and New York, in which unemployment benefits are paid to all strikers after waiting periods of 7 weeks and 8 weeks, respectively.[8] He compared this material with statistics for the balance of the United States, and also for 9 large industrial states, and concluded that the availability of unemployment compensation for strikers is not a factor in collective bargaining since strikes were not significantly longer in Rhode Island and New York than elsewhere.[9]

This court could give Ruttenberg's evidence little weight because of the many variables that were involved in the length of strikes, *e. g.*, local union strength or regional economic conditions, *see Grinnell Corp. v. Hackett*, 475 F.2d 449, 459 (1st Cir. 1973), and his control groups include states that pay unemployment benefits to strikers.[10] Moreover, the unemployment scheme for strikers in Rhode Island and New York is so different from Hawaii's as to make his thesis irrelevant. The same general criticism of uncontrolled variables applies to Ruttenberg's wage comparison studies.

Neither expert was of major assistance to the court, although the court believes that Meyers' thesis had a greater degree of validity than Ruttenberg's.

## Statistical Findings

Thirteen out of 272 strikes (4.8%) in Hawaii between 1964 and 1973 resulted in compensation paid to strikers.[11] During that period 16.1% of the total mandays lost due to strikes occurred in strikes in which compensation was paid.[12] In all but one case, unemployment benefits were received after the strike had been settled.[13]

Between 1966 and 1972, the average duration of strikes for which strikers received unemployment compensation was 64.4 days. During the same period, the average length of strikes for which benefits were not paid was 29.9 days.[14] From this relatively narrow base, it would appear that the availability of unemployment compensation does tend to lengthen the duration of strikes in Hawaii.

5. Partial Tr. Oct. 2, at 3–4; Tr. Oct. 2–3, at 136–37.

6. Mr. Ruttenberg is a labor economist and consultant, former Assistant Secretary of Labor for Manpower, and former economic advisor to Secretary of Labor W. Willard Wirtz. Tr. Dec. 10–17, at 283–86.

7. *Id.* at 322–23.

8. R.I.G.L. §§ 28–44–14 and –16 (Supp.1971); N.Y.Labor Law §§ 590(9), 592(1) (McKinney 1965).

9. Tr. Dec. 10–17, at 334, 336–37, 339; Local 1260 Exhibits 3–6.

10. *E. g.*, Hawaii, and Michigan, *see Dow Chem. Co. v. Taylor*, 57 F.R.D. 105 (E.D. Mich.1972).

11. Local 1260 Exhibits 2, 13 (court's computations). The data unfortunately include all strikes, whether within the national jurisdiction or not.

12. *Ibid.*

13. Tr. Dec. 10–17, at 656–58.

14. Local 1260 Exhibits 2, 13 (court's computations). The latter figure omits all those strikes lasting less than six days, since Hawaii has a one-week waiting period before any benefits are payable.

## The TELCO Balloting

The strike began on May 7, 1974. On May 28, 1974, the TELCO employees rejected by a 2-to-1 margin a first tentative agreement that had been reached by the negotiators.[15] Following this rejection, Director of Labor Hasegawa was paraphrased in an article in the Honolulu *Advertiser* on June 1 as stating:

> [T]he company has challenged every claim for unemployment compensation —"which they have every right to do."
>
> He said a hearing between the company and union representatives may be held in about two weeks.[16]

On June 5 another tentative agreement was reached and submitted to the membership for balloting by mail. On June 13 this second agreement was approved by more than 3-to-1.[17]

Plaintiffs not implausibly contend that the sudden shift in vote was caused by the company challenge to the payment of unemployment compensation with a concomitant dampening of the employees anticipation of the state's monetary aid.

Raymond Victor, assistant business manager of Local 1357, testified that the shift was due to the shortening of the contract period and that the second ballot was not taken at a mass meeting but by mail.

This court could not find that either theory was necessarily valid.

## The Employer Perspective

Donald M. Kuyper, Vice President of Personnel for TELCO, testified that the potential availability of unemployment benefits affected his company's offers. As negotiations were about to begin, Kuyper was aware that benefits had just been paid in the Hawaiian Electric Company strike,[18] and that the potential cost to TELCO as a result of increased payroll taxes, if benefits were paid, was in excess of $100,000.[19] He was under the impression that the union at TELCO had been checking on the availability of welfare and unemployment benefits,[20] and the possibility of strikers getting unemployment benefits was of "major significance . . . going into negotiations."[21]

After the strike had begun, Kuyper observed that the union was actively assisting strikers to file their unemployment claims.[22]

Although Kuyper did not make such a calculation during negotiations, the contribution formulae are readily available for any employer to estimate his increased tax exposure for any length strike for which its employees receive benefits. In TELCO's case, the increase is $754,000, over the two years following the strike.[23] When compared with the

15. Pretrial order, Oct. 1, 1974, at 13–14.

16. *Id.* at 14–15; Plaintiffs' Exhibit 15.

17. Pretrial order, Oct. 1, 1974, at 15–16.

18. Tr. Oct. 1, at 69. Bargaining began just after the award of benefits to Hawaiian Electric Company strikers of approximately $100,000 was announced.

19. Tr. Oct. 1, at 105. Since Hawaii's unemployment compensation statute bases employer contributions on their experience ratings, *i. e.*, the amount of benefits paid their employees, an employer's decision to keep operating during a strike may lead to an increase in his tax rate. *See* H.R.S. §§ 383–63 to –70 (1968 & Supp.1974).

20. Tr. Oct. 1, at 71.

21. *Id.* at 72: "The closeness of the Electric Company case was certainly in my mind; in addition to that, however, there were other factors that I think were also very relevant. One was that we had come through a recent period of layoffs, there was a great concern for job security. Secondly, there had been a lot of articles in the paper in relationship to the cost of living—the increased cost of living and also, of course, many articles in relationship to the controls coming off, so that those three plus the unemployment benefits were probably the four most significant things that I had in mind as we entered the negotiations."

22. *Id.* at 73–74, 82–83.

23. Pretrial order, Oct. 1, 1974, App. A (lodged Sept. 18, 1975).

estimated extra $320,000 the initial contract would have cost the company, the magnitude of this tax burden leads to the inescapable inference that there will be occasional instances where it is cheaper for an employer to accede to union demands he otherwise would have rejected, than to run the risk of a prolonged strike.

Bernard T. Eilerts, Executive Vice President of the Hawaii Employers Council during the TELCO strike and at the time of trial, with a background of extensive experience in advising employers and participating directly in bargaining,[24] testified that the potential availability of unemployment insurance is generally considered in determining bargaining strategy.[25]

Eilerts concluded that the potential availability of benefits lengthened the TELCO strike and generally leads to higher settlements where the employer realizes it has to keep operating during a strike.[26]

Neither management witness could quantify the impact of Hawaii's unemployment insurance law on collective bargaining.[27]

The very fact that the employers reasonably perceive the potential or actual availability of benefits as an aid to their bargaining adversary *itself* evidences an effect upon the collective bargaining process.

The Hawaii "stoppage of work" test requires an inquiry into how much the employer's business was curtailed.[28] This administrative study by the state unemployment division requires exhaustive examinations as to the volume, cash flow, and services affected.[29] In other words, the state seeks to determine how effective the strike has been, which is precisely one of the things a union would be curious to know—as it considers whether to continue the dispute, and what its bargaining position will be. But for the state involvement, TELCO would *not* give this information to the union.[30]

### The Union Perspective

Employee finances are an important aspect of strike planning because they are key determinants of how long the employees can stay away from work. As a result, many unions in Hawaii send questionnaires to their members to help them analyze their resources in preparation for a potential strike.[31]

Defendants' expert, Mr. Ruttenberg, conceded that (1) the existence of a strike fund may be a significant factor in the results of collective bargaining;[32] (2) the existence of a large available source of funds during a strike is used by unions to impress employers that the union has the resources to back up a threat to strike;[33] and (3) the loss of income to strikers is a factor in the minds of strikers when deciding whether to accept an employer's collective bargaining offer.[34] In short, he admitted that a fair summary of his position was that the amount of money a striker is losing "goes through his mind along with other factors and it may have an impact on his decision or does have an impact . . .";[35] and that the source of a striker's funds, whether it be unemployment compensation or union benefits from a strike fund, makes no

24. Tr. Oct. 1, at 150, 158, 160–63.

25. *Id.* at 154, 155–56, 164, 274, 278–79.

26. *Id.* at 274–75.

27. *Id.* at 250–52, 275, 299, 339, 341.

28. *See Meadow Gold Dairies v. Wiig,* 50 Haw. 225, 437 P.2d 317 (1968).

29. Pretrial order, Oct. 1, 1974, at 10.

30. Tr. Oct. 1, at 83–84.

31. Tr. Dec. 10–17, at 183, 232, 250.

32. *Id.* at 465–66.

33. *Id.* at 467.

34. *Id.* at 581–83.

35. *Id.* at 586.

difference with respect to the impact on the striker's decision.[36]

The benefits potentially available to TELCO strikers constituted a large percentage of their net take-home pay.[37]

Various union officials testified that no thought was given to the availability of unemployment compensation either in preparation for negotiations, during negotiations, or during the course of strikes.[38] However, Local 1357's assistant business manager, Raymond Victor, was asked by a TELCO employee about the possibility of benefits, at a membership meeting a few months before the TELCO strike. Victor testified that he told the employees "there's no way to determine whether anybody is going to get paid."[39] Then he said he supposed that the employee

> was trying to tell us to get the information before time so that they would know whether they should make up their mind to strike or not . . . .
> . . . I assume he was asking that question to determine whether they should use that as a factor whether they wanted to consider going on a strike.[40]

While certainly not conclusive, a necessary inference to be drawn from his testimony is that at least one union official *believed unemployment benefits to be* a potentially important factor, or thought that some of the membership believed them to be potentially important.[41]

After the TELCO strike was settled and this case was about to come to trial, a leaflet was distributed to TELCO workers bearing the typewritten attribution "Gwen Pascua," a shop steward for Local 1357.[42] The leaflet was a call to rally in protest against the employer's legal action:

> [T]he ink was hardly dry on the contract when the G. T. & E. bosses showed us what they thought of the truce. They sent their fancy lawyers to federal court to sue the State to prevent payment to us of our unemployment compensation, which we were entitled to under State law. By our labor we earned the profits and paid the state taxes that finance the State Unemployment Fund. Now the company, with the help of the courts and their Big Business allies in Hawaii and all over the U. S., is trying to rob us of our benefits, to the tune of hundreds of thousands of dollars, and *trying to undermine our ability and right to strike in the future.*
>
> · · · · ·
>
> We must realize that all workers in Hawaii and in 25 other states will be hurt by a bad decision by Judge Pence. Don't we have a responsibility to carry our struggle through, now that the bosses have picked up the club to use against us and all workers, and beat back this attack and *defend our right and ability to strike?* Don't we have a responsibility to the many workers who supported us when

---

36. *Id.* at 587. Notwithstanding the foregoing admissions, Ruttenberg maintained in his testimony that funds offsetting wage losses were not important "when the chips are down." *Id.* However, he could not name a single other writer who supports his position, *id.* at 491–95, and could not explain how other well-recognized experts have taken a diametrically contrary position, *see id.* at 487, 647–48.

37. *See* Pretrial order, Oct. 1, 1974, App. B.

38. Tr. Dec. 10–17, at 51, 151–52, 155–56, 166, 215–16, 229.

39. *Id.* at 51.

40. *Id.* at 60–61.

41. No amount of union disclaimer was capable of convincing all members that "there's no way to determine whether anybody is going to get paid." Some of the membership apparently believed they would be eligible for benefits. Tr. Oct. 1, at 261–62.

42. *Id.* at 88–91; Plaintiffs' Exhibit 42. Defendants did not dispute that she was the author of the leaflet, nor her position with the intervenor-defendant union, nor that she was acting within the scope of her authority as a steward.

we were on strike to make sure that our bosses' action in court doesn't *cripple their own strikes in the future?* [43]

Since some union participants believe unemployment compensation to be a potentially important factor, this court cannot conclude that it is entirely extraneous to the collective bargaining process.

*Factual Conclusions*

From the preceding, as well as the facts found in this court's prior decision, this court finds: (1) 16.1% of total man-days lost are attributed to states in which compensation was paid; (2) the presence of potential unemployment benefits probably tends to lengthen strikes; (3) the employer's approach to bargaining is affected by the potential additional tax burden; (4) potential increases in tax contributions tend to make employers settle when they otherwise would not; (5) unions are given access to valuable confidential information about the success of strikes during the course of state administrative hearings on benefits; the appealability of those hearings is used as a bargaining chip; (6) employee finances are key determinants of the success of strikes and strike threats; (7) unemployment benefits, if granted, provide a large percentage of striking workers' take-home pay; (8) union members and officials perceive that unemployment benefits contribute to their ability to strike and maintain it. Therefore, this court finds that Hawaii's unemployment insurance statute as interpreted by the Hawaii Supreme Court palpably affected the labor

relations between TELCO and the IBEW, and similarly affects all other Hawaii employers and unions in every collective bargaining conflict and "is a factor lurking in the background of every incipient labor contract" [44] where the employer may desire to carry on business during a strike.

## ANALYSIS OF THE ACTS AND THE LAW

The Social Security Act of 1935 did not set up a federal unemployment compensation system. Rather it made it possible for the states to establish their own systems and to provide incentives for them to do so.[45] State legislatures had considered the matter of unemployment compensation prior to the Congressional enactment but most of them had defeated such bills, fearing that a tax to finance their systems would handicap their industries in competition with those of other states.[46]

Congress overcame this problem and accomplished its objective primarily by imposing a national payroll tax on employers against which a credit is allowed for contributions made by them to qualifying state unemployment compensation funds.[47]

While this country's unemployment insurance scheme is a cooperative state-federal venture, *see Steward Machine Co. v. Davis*, 301 U.S. 548, 587–89, 57 S. Ct. 883, 81 L.Ed. 1279 (1937), the mere fact that the unemployment laws are under a federal umbrella does not in itself alter the preemption problem. See *Nash v. Florida Industrial Commission*, 389

43. Plaintiffs' Exhibit 42.

44. *Super Tire Eng. Co. v. McCorkle*, 416 U. S. 115, 124, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

45. S.Rep.No.628, 74th Cong., 1st Sess. 12 (1935).

46. *Id.* at 11; *Steward Mach. Co. v. Davis*, 301 U.S. 548, 587–89, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).

47. S.Rep.No.628, 74th Cong., 1st Sess. 12 (1935); *see* 26 U.S.C.A. §§ 3301–09 (1967, Supp.1975) (Unemployment Tax Act); 42 U.S.C.A. §§ 501–04 (1974) (grants to states for unemployment compensation administration); *id.* §§ 1101–08 (unemployment trust fund). If a state unemployment compensation law does not meet federal standards, the tax credit to its industries is denied. 26 U.S.C.A. §§ 3302(a)(1), 3304 (1967, Supp. 1975).

U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967). The role Congress played in shaping the nature of state laws is materially relevant to the subject of Congressional intent to preempt, *see infra.* It must be kept in mind that this is not a case of conflict between two federal laws: the statute being challenged is not the Social Security Act but rather the Hawaii Employment Security Law as interpreted by its courts.[48]

### Labor Law Preemption

The law of labor preemption to date has focused on state interference with employee activity protected or prohibited by the federal labor laws.[49] The principles of those cases, however, provide initial steps in analyzing whether state interference with employer activity, or state assistance to employee activity, is likewise preempted.

█ It is now axiomatic that state laws may not interfere with employee activities *protected* or *prohibited* by §§ 7 and 8 of the N.L.R.A.[50] Under the Supremacy Clause, since the Act guarantees federal rights, state laws that conflict with the federal legislation are invalid. *See Garner v. Teamsters Local 776,* 346 U.S. 485, 490–91, 74 S.Ct. 161, 98 L.Ed. 228 (1953); *San Diego Building Trades v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 276, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). The *Garmon* principle, however, is not a constitutional rule. *Retail Clerks Local 1625 v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963).

*Local 20, Teamsters v. Morton,* 377 U.S. 252, 256–61, 84 S.Ct. 1253, 12 L. Ed.2d 280 (1964), sets out a basic rationale for analyzing previous labor law cases and bringing them within a unified system of preemption analysis.[51] *Morton* dealt with union activity that was clearly neither protected nor prohibited by federal labor laws, so the issue did not fit within any of the previous cases. The Court ruled, *id.* at 259–60, 84 S.Ct. at 1258:

> Allowing [the activity] is a part of the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community. . . . If the Ohio law . . . can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe . . . the inevitable result would be to frustrate the congessional determination . . . and to upset the balance of power between labor and management expressed in our national labor policy.

Professor Archibald Cox, in analyzing the post-*Morton* law of preemption,[52] finds the key Congressional labor policies are the right to organize and to strike; and the solution of labor differences through collective bargaining enforced by economic sanctions.

It must be recognized that there is both an explicit and an implicit framework to the labor laws. The Taft-Hartley Act[53] explicitly forbids certain employer and union activities. Impliedly, the fact that there is no duty to reach agreement—merely a duty to bargain in good faith[54]—means there is freedom to bring economic pressure to bear on

---

48. *See New York State Dep't. of Social Serv. v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1972).

49. *See,* Cox, *Labor Law Preemption Revisited,* 85 Harv.L.Rev. 1337 (1972).

50. 29 U.S.C.A. §§ 157, 158 (1973 & Supp. 1975); *see* Cox, *supra* note 49, at 1340–51, and cases cited therein.

51. *See* Cox, *supra* note 49 at 1350–51.

52. *See id.* at 1351–59.

53. Labor Management Relations Act of 1947, ch. 120, 61 Stat. 136 (codified in scattered sections of 18, 29 U.S.C.A.).

54. 29 U.S.C.A. § 158(d) (1973 & Supp. 1975).

collective bargaining. *See American Ship Building Co. v. NLRB,* 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

Congress, sometimes through the NLRB, attempts to balance the competing interests. All rules involve "nice judgments" [55] as to whether one approach or another would be more likely to obtain Congressional objectives. Nevertheless, the states, after *Morton,* cannot enforce their own views as to what the proper balance of those interests might be. Even in the absence of direct conflict between state and federal laws, the national scheme preempts the state power to act.[56]

While *Morton* explains the prior cases that deal with state infringement upon *employee* activity, it also applies to the issues that now face this court: state *aid* to *employee* activity or *infringement* of *employer* activity.[57]

The underlying problem in every preemption case is to determine the *outer limits* of Congressional concern; beyond these, there is no preemption. A court cannot "declare pre-empted all local regulation that touches and concerns in any way the complex interrelationships between employers, employees, and unions; obviously, much of this is left to the States." *Motor Coach Employees v. Lockridge, supra* 403 U.S. at 289, 91 S.Ct. at 1919.

Congress passes the federal labor laws within a larger framework of state law that creates property rights and regulates general welfare under the Tenth Amendment. State laws fall outside the limits of Congressional preemption if they

apply to the general public . . . without regard to whether the individual is an employer, union, or employee concerned with unionization or a labor dispute.

° . • • • • •

It is only where the state law . . . is based upon an accommodation of the special interests of employers, unions, employees, or the public in employee self-organization, collective bargaining, or labor disputes that the likelihood that its application . . . will upset the balance struck by Congress is so great as to require exclusion of state law unless Congress has provided otherwise.[58]

The "stoppage of work" test of striker eligibility for unemployment compensation, as interpreted by the Hawaii Supreme Court, inquires directly into the success or failure of a strike to close down an employer's business, e. g., benefits may be paid only if the employer keeps its operation substantially ongoing. *See Hawaiian Telephone Co. v. State of Hawaii,* 378 F.Supp. 791, 792 (1974) (decision on preliminary injunction). By focusing on the effect of collective action by employees upon the employer's business operations when the parties are in the throes of a collective bargaining conflict, it impinges upon "the very subject addressed by Congress in the NLRA," and therefore is preempted,[59] unless Congress has provided otherwise.[60]

---

**55.** Cox, *supra* note 49, at 1353.

**56.** There is no part in the formula for a "balancing" of federal and state interests, as suggested by the First Circuit in *Grinnell Corp. v. Hackett,* 475 F.2d 449 (1st Cir. 1973), and *ITT v. Minter,* 435 F.2d 989 (1st Cir. 1970).

   *Head v. New Mexico,* 374 U.S. 424, 83 S. Ct. 1759, 10 L.Ed.2d 983 (1963), and *Buck v. California,* 343 U.S. 99, 72 S.Ct. 502, 96 L.Ed. 775 (1952), inquire only as to whether there is a conflict between the statutes, but do not balance the interests underpinning them. Likewise, all the labor cases cited in the text *supra* do not refer to a weighing of interests.

**57.** *See* text accompanying notes 3–43 *supra.*

**58.** Cox, *supra* note 49, at 1355–56.

**59.** *Id.* at 1357.

**60.** *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 297, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

*Congressional Intent*

At the very inception of the problem of trying to find "the intent of Congress," it must be recognized that for the most part, "the principle of pre-emption that informs our general national labor law was born of [the Supreme] Court's efforts, without the aid of explicit congressional guidance." *Motor Coach Employees v. Lockridge, supra* 403 U.S. at 286, 91 S.Ct. at 1918. The cooperative federal-state nature of our unemployment laws,[61] however, has from time-to-time brought forth expressions of Congressional views on the payment of unemployment benefits to strikers.

Congress itself, in formulating the District of Columbia laws has always excluded strikers from unemployment benefits.[62] Congress passed the first provision simultaneously with the Social Security Act of 1935.

Congressional creation of policy for the District of Columbia, however, cannot be taken as an absolute in gauging its intent nationally. Because the District has no Congressional vote, Congress legislates for the District in a relative political vacuum, compared with political pressures upon it in formulating national legislation. At the most, one can conclude that Congress *might* have wished the District's policy upon the states *if* it did not have to heed its several constituencies.

Defendants argue that the Social Security Board, "certainly knowing the intent of Congress, approved state laws providing for unemployment compensation for strikers."[63] This fact is immaterial, since the Board was mandated to approve all state laws that met minimum conditions specified by Congress.[64]

Defendants also point to Congressional inaction in 1935 on several recommendations that state laws be required to deny benefits to strikers.[65] Careful examination of the legislative record, however, does not reveal whether Congress ever expressly considered these recommendations, all of which were contained in lengthy written reports, and none of whose proponents urged them upon the Congressional attention during hearings.[66]

Subsequent Congresses considered various proposals to eliminate benefits to strikers. All the legislative history argued by the parties here was fully explored by the First Circuit in *Grinnell, supra* at 454–57, in the context of a challenge of the Rhode Island law which, similar to New York's, provided for payment of unemployment benefits to strikers after a six-week waiting period subsequent and in addition to the general waiting period for all unemployed claimants.

For the purpose of this decision, the *Grinnell* opinion's reference to Nixon's proposal in 1969 to deny unemployment benefits to strikers must be amplified. Nixon's message accompanying the proposal explained the strike provision as follows:

> *Workers on Strike.*—The unemployment tax we require employers to pay was never intended to supplement strike funds to be used against them. A worker who chooses to exercise his right to strike is not involuntarily unemployed.

---

61. *See* notes 45–48 *supra* and accompanying text.

62. Since 1935, the law in the District of Columbia, although amended, has always excluded strikers. Act of Aug. 28, 1935, ch. 794, § 10(a)(6), 49 Stat. 946; Act of June 4, 1943, ch. 117, § 10(f), 57 Stat. 100; Act of Aug. 31, 1954, ch. 1139, § 10(f), 68 Stat. 988.

63. Brief for Locals 1260 and 1357, and Hawaii State Federation of Labor, at 25.

64. S.Rep.No.628, 74th Cong., 1st Sess. 47 (1935); *see* 26 U.S.C.A. § 3304(a) (1967, Supp.1975).

65. *Hearings on S. 1130 Before the Senate Comm. on Finance*, 74th Cong., 1st Sess., at 228, 472, 959 (1935).

66. *Id.* at 113, 121, 133, 223, 237, 238, 463, 959.

In two States, workers on strike are paid unemployment insurance benefits after a certain period. This is not the purpose of the unemployment insurance system.

*I propose a requirement that this practice of paying unemployment insurance benefits to workers directly engaged in a strike be discontinued.*

Hearings Before the Committee on Ways and Means of the House of Representatives on H.R. 12625, 91st Cong., 1st Sess. 12 (1969).

The draft amendment contained the following provision, to be inserted after paragraph (6) of § 3304(a) of the Internal Revenue Code:

(10) compensation shall not be paid *by reason of the expiration of a specified period of time* to an individual who has been disqualified under a labor dispute disqualification provision in such State law; (emphasis added) (*id.* at 25)

Similarly, the Taft-Hartley Act as passed by the House containing a provision that would have removed a striker from the status of employee if he was receiving unemployment compensation (see *Grinnell* and briefs) was also aimed at New York and Rhode Island statutes, even though the language was broad enough to affect strikers in Hawaii today.

The House provision, deleted in conference with the Senate, read:

employee . . . shall also include any individual whose work has ceased as a consequence of a current labor dispute (unless such individual has been replaced by a regular replacement, or has obtained other regular and substantially equivalent employment, or is receiving unemployment compensation from any State)

. . . .

1 NLRB Legislative History of the LMRA 161 (1947).

The House Committee Report accompanying the bill explained the purpose of the provision as follows:

*A few States pay strikers after the fifth, sixth, or seventh week of a strike.* This clearly is a perversion of the purposes of the social security laws . . . . We therefore have provided that a striker's status as an "employee" stops when he starts receiving unemployment compensation from any State. He may receive relief from his union, from local welfare funds, or from charity without losing that status. (Emphasis added)

*Id.* at 303–04.

The minority report, *id.* at 359, said:

The bill apparently intends to discourage States from paying unemployment compensation to strikers by penalizing employees who accept unemployment compensation. Under the Social Security Act, however, the determination of those matters was advisedly left to the States.

From this court's analysis it seems unmistakable that by Congressman Mills' statement upon the 1969 legislation—"There are two States . . . which pay unemployment benefits when employees are on strike" (*Grinnell*, at 455)—he was referring to the New York and Rhode Island type of unemployment acts, acts which have a fundamental difference from Hawaii's, in the scope of their application.

There is no point in this decision to retrace the same road toward determination of Congressional intent that was so laboriously trudged by Judge Coffin in *Grinnell*. On the broad problem of payment of unemployment compensation to strikers, this court agrees with *Grinnell*, at 457 that "unambiguous Congressional intent is lacking" and (at 454):

the existing legislative record is not sufficiently clear to establish Congressional intent either way, it strongly indicates Congressional awareness, the availability of opportunities to act, and Congressional action in closely related matters which would prove relevant *should the evidence on infringement and state interests be closely balanced.* (Emphasis added.)

### The "Work Stoppage" Provision

Neither from *Grinnell* nor from this court's own research is there any evidence that Congress was ever aware of the "work stoppage" problem imposed by the unemployment compensation act adopted in Hawaii and some other states.

As heretofore indicated, H.R.S. § 383–30 disqualifies one for benefits under "(4) Labor dispute. For any week . . . that his unemployment is due to a stoppage of work which exists because of a labor dispute at the . . . establishment . . . at which he is . . . employed."

"Like most other aspects of the Draft Bill, the stoppage of work requirement had its origin in the British Unemployment Insurance Acts",[67] social legislation which preceded the American acts by over 20 years. It was natural therefore for the American courts to look to the decisions of the British Umpires for precedent in the interpretation of what superficially appears to be simple language. Unfortunately, where employees and employers are at odds, "nothing is simple." Shadur[68] continues:

> When this country's fifty-one statutes were adopted, the phrase had long since acquired a settled construction from the British Umpires as referring "not to the cessation of the workman's labour, but to a stoppage of the work carried on in the factory, workshop or other premises at which the workman is employed." It is scarcely surprising that the overwhelming majority of appellate decisions in the United States have adopted the same interpretation. (Footnotes omitted.)

That this "settled construction" may have not been so simple and finite as stated by Shadur and assumed by American courts is shown in the July 1946 study of "Principles Underlying Labor-Dispute Disqualification" made by Marsile J. Hughes of the Illinois Division of Placement and Unemployment Compensation at the request of the Federal Bureau of Employment Security and sent to state unemployment agencies. After making a detailed analysis of the "Analytic Guide to Decisions by the [British] Umpire", Hughes states:

> [I]t is apparent that the British authorities in determining whether a stoppage of work existed looked first to see whether any job vacancies were created by the dispute.

> . . . . . .

> Under the British interpretation of the word "stoppage" the individual is disqualified for benefits if his unemployment is due to a trade dispute so long as the job which he held continues to be vacant. It would be necessary for the claimant to show that the job vacancy had been filled in some way in order to effect a termination of his disqualification. Vacancies might be terminated by the return of the worker, by the hiring of a replacement, or by a readjustment of work operations.[69]

Hughes' conclusions validate plaintiffs' contention that the Umpires' interpretation of "stoppage of work" would preclude payment of benefits to strikers unless they were permanently replaced or their jobs were eliminated.

### American Decisions

Assuming the plaintiffs' version of the Umpires' decisions to be correct, it appears that the American courts that first considered the issue were correct in their results but used imprecise conclusitory language, just as did Shadur, with an almost inescapable overbroadening of the British rule.

The earliest case cited is *Magner v. Kinney*, 141 Neb. 122, 2 N.W.2d 689 (1942). This involved a strike that began after an impasse in collective bargaining. There is no evidence that the strikers were replaced, and the action decreased total business transacted by

---

67. Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification*, 17 U.Chi. L.Rev. 294, 308.

68. *Ibid.*

69. M. Hughes, *Principles Underlying Labor-Dispute Disqualifications* 26 (1946).

the employer more than 30 per cent. The court adopted what it believed to be the Umpires' construction, viz., " 'stoppage of work,' . . . is a substantial curtailment of work in an establishment, not the cessation of work by the . . . claimants." 2 N.W.2d at 692. The court concluded that 30 per cent curtailment of business was "substantial" and denied benefits.

*Lawrence Baking Co. v. Michigan Unemployment Compensation Commission,* 308 Mich. 198, 13 N.W.2d 260 (1944), is repeatedly cited as the leading case on the issue. The case arose from an organizational strike, in which 16 union members of plaintiff's 98 employees went on strike, disrupting operations for about 15 minutes. The employer "immediately" hired replacements and notified the strikers of this fact. *Lawrence Baking* did not rely directly on incorrect reading of the Umpires' construction of work stoppage, although it quoted at length from *Magner.* Rather, it argued that the interpretation given Nebraska's law by the *Magner* court is part of the evidence that Michigan intended the same construction when it later adopted similar statutory language. 13 N.W.2d at 262–63. The court affirmed the award of benefits to the strikers, the same result that would have obtained had the Umpires' approach been followed, since the strikers had been replaced.

By the time the Hawaii Supreme Court ruled in *Inter-Island Resorts v. Akahane,* 46 Haw. 140, 377 P.2d 715 (1962), the American version of the work stoppage test was firmly ensconced, and broad enough to provide benefits to employees who had not been replaced after going on strike. An organizational strike had been called against the Kona hotel. During the first two days, the hotel operated with the help of supervisors and guests. Service was somewhat curtailed but the hotel remained open. Later in the week, the employer hired some replacements and full operations resumed. The union was informed that 11 positions were still

vacant; 32 employees had begun the strike. The positions were not accepted.

As to those employees who had been replaced, the British Umpires' interpretation of work stoppage would allow payments of benefits. The Hawaii court went further, however, and found all the claimants to be eligible under the American work stoppage test. The same general pattern reoccurred in *Gaspro v. Labor & Ind. Rel. Comm'n,* 46 Haw. 164, 377 P.2d 932 (1962), viz., an organizational strike, Gaspro shut down temporarily, then permanent rehire and business continued. The strikers lost their jobs.

The holdings of both *Akahane* and *Gaspro* would have been justified under the British construction of "work stoppage."

It was with *Meadow Gold Dairies v. Wiig,* 50 Haw. 225, 437 P.2d 317 (1968), that Hawaii, like many other state courts having similar "stoppage of work" clauses in their unemployment acts, went far beyond the British rule and gave benefits to strikers—without regard to job loss—when the employer was able to keep up substantial (about 80% in Hawaii) operations.

*The Legal Issue*

*Meadow Gold* and the subsequent state awards anent the Hawaiian Electric strike thus have with certainty in Hawaii created the problem now before this court: Has Hawaii's interpretation and application of the "stoppage of work" clause in its Unemployment Compensation Act so impermissibly altered and affected the relative economic strength of union versus employer in their bargaining relationship, as to thereby encroach upon and into the field preempted by the NLRA in violation of the Supremacy Clause of the Constitution?

*Congressional Intent and the Issue*

As heretofore found, even in the broader problem of payment of benefits to strikers, where the issue of "work stoppage" is not involved, a clear determination of "Congressional intent" can-

not be made. Moreover, on the question of work stoppage and payment to strikers, not even a whisper of "Congressional intent" has been heard. The *best* that can be said is that its intent is ambiguous in this labor law area. Although any clarity of Congressional intention be lacking, the court must nevertheless decide whether Hawaii's law impermissibly interferes in a federally preempted field. Under the preemption doctrine, state legislation may be invalid even if it does not directly interfere with federal legislation.[70] When the legislative schemes underlying the Social Security Act and the N.L.R.A. are compared, it is apparent that in the labor area, except in the narrow area in which the states' traditionally intense interest in public order survives, Congress intended to preempt the labor field.[71]

*Employers' "Rights"*

■ Plaintiffs have maintained and defendants have denied that an employer has a right under the N.L.R.A. to keep his business operating during a strike. True, there is no specific statement in the N.L.R.A. that an employer has such a right. That right exists, nevertheless. As the Ninth Circuit said in *Hawaii Meat Co. v. NLRB,* 321 F.2d 397, 400 (1963): "No case holds that a struck employer may not try to keep his business operating; on the contrary, it is quite clear that he has the right to do so." In accord are *NLRB v. Mackay Co.,* 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), as well as *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 232, 831 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

SYNTHESIS OF FACTS
(as found here and in this court's prior decision)

A. *Employees*

1. No striker's job was ever in jeopardy.
2. Before the strike, at least some employees were concerned about receiving unemployment benefits.
3. During the strike, almost all 3000 strikers applied for and expected to get benefits.
4. The benefits would provide for a large percent of a strikers regular pay, *i. e.,* needs.
5. Strikers, after filing of the instant suit, condemned the action as diminishing "our ability to strike."
6. Ruttenberg acknowledged impact of benefits.

B. *Employers*

1. TELCO states possible payment of benefits and additional tax burden affected bargaining offer.
2. TELCO's negotiator stated it was a factor in the talks.
3. TELCO was ordered by the state to divulge its financial and operative facts to the state (and union) during the strike.
4. TELCO was facing a possible tax "contribution" of over $190,000 per week of strike, with no assurance of recovery, while it kept business operating.

C. *State*

1. State actively assisted union and strikers in filing claims.

---

70. *See Conceptual Refinement of the Doctrine of Federal Preemption,* 22 J.Publ.L. 391 (1973) ; Note, *Federal Preemption,* 1966 Duke L.J. 484.

71. Cox, *supra* note 49, at 1358. Hawaii's interest in paying unemployment benefits to strikers is in no way analogous to state interest in preventing violence on the picket line, *see San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed. 2d 775 (1959), and therefore not within the public order exemption.

2. State demanded disclosure of TELCO's earnings and other financial data during strike.

3. If an employer closes down operations during a strike, the state pays no benefits to strikers.[72]

## CONCLUSIONS

■■ It was unquestionably the intent of Congress that collective bargaining, free from state interference, should be the foundation of the federal labor policy. *Local 24, Teamsters v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959); *Local 20, Teamsters v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). Employer and employees alike have a right to the benefit of every privately furnished economic weapon available in implementing their respective bargaining positions, in carrying on or opposing a strike. Contributions by fellow unions and employers are permitted.[73] Unless the state activity is but a peripheral concern of the Act or there is an overriding state interest, a state may not assist either party in a labor dispute, *i. e.,* interfere with free collective bargaining,[74] a state must be neutral.

> For a State to impinge on the area of labor combat designed to be free is quite as much an obstruction of Federal policy as if the State were to declare picketing free for purposes of or by methods which the federal Act prohibits. *Garner v. Teamsters,* 346 U.S. 485, 500, 74 S.Ct. 161, 98 L.Ed. 228 (1953).

Under Hawaii's law, when the avowed objective of closing down the employers plant [75] is achieved by the union, no benefits may be paid the strikers. The state is then neutral. When, however, the employer is successful in resisting the union attack, and keeps his business in substantially full operation, the state, after the first week of the strike, takes sides against the employer, and for the strikers. As indicated, it sets about giving great financial assistance to the strikers, and extracting valuable (to the strikers) financial and other information, as well as burdening the employer with future increased tax burdens. The strikers' position when a strike is called, with the state's assist, becomes one of "heads I win, tails you lose"!

■ On its face, therefore, Hawaii's statute irreconcilably intrudes into the federal process of free collective bargaining.

It cannot with any validity be argued that Hawaii's law implements any necessary "state purpose". The striker picketing a closed-down shop is just as in need of benefits as is the striker picketing a shop in full operation. Nevertheless Hawaii now gives aid to the latter but none to the former.

Congress has never even inferred that it approves this anomalous situation. In the absence of any Congressional approval, it can only be said that Hawaii's statute impermissibly intrudes into the area of labor law fully occupied by the N.L.R.A. The application of Hawaii's law also clearly frustrates Congress' ukase that the collective bargaining process must be free from state interference. Hawaii's statutory scheme for unemployment assistance to strikers therefore cannot stand, but must be stricken down.

72. A vital facet of the factual inquiry before this court is *not* whether benefits are paid to strikers. Rather, under *Grinnell,* it is whether the payment of money in fact *affects* the collective bargaining process or is *extraneous* to that process.

73. *Kennedy v. Long Island Rail Road Co.,* 319 F.2d 366 (2nd Cir. 1963); *Air Line Pilots Assn. International v. C. A. B.,* 163 U.S.App.D.C. 451, 502 F.2d 453 (1974).

74. *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); *Plumbers' Union v. Borden,* 373 U.S. 690 (1963); *Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); *John Hancock Mutual Life Insurance Co. v. Commissioner of Insurance,* 349 Mass. 390, 398, 208 N.E.2d 516, 522 (1965).

75. Henry B. Epstein, state director of the U.P.W., Tr. Dec. 10–17, at 207, 229.

TELCO's prayer for a permanent injunction is granted.

Plaintiffs will prepare the order. TELCO's bond is cancelled.

## AMENDED DECLARATORY JUDGMENT AND ORDER FOR PERMANENT INJUNCTION

It is hereby ordered and declared that defendants' payment or consideration for payment of claims for unemployment compensation benefits for periods of unemployment incurred by claimants' participation in a strike against an employer engaged in interstate commerce, as Hawaii Revised Statutes, Section 383–30(4), has been and is now applied, constitutes an unlawful and impermissible infringement upon the scheme of collective bargaining established and preempted by Congress, in violation of the supremacy clause of the Constitution of the United States;

It is further ordered and declared that H.R.S. § 383–30(4), insofar as it presently is administered to disqualify other claimants unemployed due to a labor dispute, is valid; .

It is further ordered and declared that the State of Hawaii Department of Labor and Industrial Relations and its Director and employees shall permanently cease and refrain from investigating, processing, disclosing information regarding employer operations, or making payment upon claims for unemployment compensation filed by or on behalf of any individual employed by Hawaiian Telephone Company whose unemployment during the period from May 7 to June 16, 1974, was due to a labor dispute at the factory, establishment or other premises of Hawaiian Telephone Company during such period, or by or on behalf of any other individual employed by any other employer engaged in interstate commerce or in an industry affecting interstate commerce, as such employer or industry is defined by the National Labor Relations Act, if such individual's unemployment is due to a labor dispute at the factory, establishment or other premises of such employer;

It is further ordered and declared that nothing herein shall prevent or enjoin any person from filing any claim for State of Hawaii unemployment benefits;

It is further ordered and declared that with respect to labor disputes involving an employer engaged in interstate commerce or in an industry affecting interstate commerce as defined in the National Labor Relations Act and related claims for unemployment compensation benefits requiring application of H.R.S. § 383–30(4) arising after the entry of this Judgment, the Department of Labor and Industrial Relations shall refrain from investigating such claims until leave of court is obtained for good cause, upon at least 48 hours advance notice to the employer and labor organizations involved in said labor dispute;

It is further ordered and declared that the Director of the State of Hawaii Department of Labor and Industrial Relations shall, effective December 1, 1975, advise all claimants for unemployment compensation that claims will not generally be processed nor benefits paid for periods during which claimant is on strike or otherwise not working due to participation in a labor dispute with an employer engaged in interstate commerce or an industry affecting interstate commerce;

It is further ordered and declared that there being no just reason for delay, that Count II of the Complaint herein shall be and hereby is ordered dismissed without prejudice. In the event plaintiffs renew Count II, no finding of laches or statute of limitations shall bar relief otherwise found therein to be appropriate, provided timely renewal is made by plaintiffs subsequent to any dissolution or modification of these orders.

It is further ordered and declared that the Clerk shall enter this Amended Order as the final Judgment herein in lieu of any prior Judgment entered and that each party shall bear its own costs of these proceedings.