**NEW YORK TELEPHONE COMPANY, Western Electric Company, American Telephone & Telegraph Company Long Lines Department, and Empire City Subway Company (Limited), Plaintiffs,**

v.

**NEW YORK STATE DEPARTMENT OF LABOR, Louis L. Levine, Industrial Commissioner of the New York State Department of Labor, New York State Department of Taxation & Finance, and James H. Tully, Jr., State Commissioner of Taxation and Finance, Defendants.**

No. 73 Civ. 4557.

United States District Court,
S. D. New York.

May 23, 1977.

## 812

Aranow, Brodsky, Bohlinger, Benetar & Einhorn by David L. Benetar, George E. Ashley, William P. Witman, Stanley Schair, Mark H. Leeds, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. by Maria L. Marcus, Stuart I. Greenberg, Ralph L. McMurry, Asst. Attys. Gen., Nicholas G. Garaufis, Deputy Asst. Atty. Gen., New York City, for defendants.

OWEN, District Judge.

In 1971 most employees of the entire nationwide Bell Telephone Company system (Bell System) went on strike. Within days, the strike was settled and there was a return to work at all units except those in New York State, where employees continued on strike for seven months. After the first eight weeks, many of the striking employees began receiving as much as $95.00 per week tax-free as unemployment compensation under New York law, which continued for the duration of the strike. By its conclusion, the strikers had received some $49,000,000 from the Compensation Fund and the New York Telephone Company (Telco) was faced with making up a $40,-000,000 depletion in its credit in the said Fund.

The plaintiffs, New York State units of the Bell System, brought suit for the recovery of funds paid, to restore its lost credit position, and for a declaration that New York Labor Law § 500 et seq., to the extent it mandates payment of unemployment compensation to strikers [1] is unconstitutional. By stipulation the liability issues were severed and separately tried.

The two principal questions raised on the non-jury trial before me are (1) whether the availability, receipt or expected receipt of unemployment insurance benefits for strikers under New York law exerts a significant impact on (a) collective bargaining and the demands and positions of the parties taken in connection therewith, (b) the incidence of strikes, (c) their duration or (d) the timing, nature and costs of collective bargaining settlements; and (2) has federal law preempted this field, requiring the state enactment to give way to federal policy.

Plaintiffs here, Telco, Western Electric Company (Weco), American Telephone & Telegraph Company Long Lines Department (Long Lines), and Empire City Subway Company (Limited) (Empire), are all part of the overall Bell System. Ninety per cent of the Bell System's non-management employees are members of unions, and seventy per cent are represented by the Communications Workers of America (CWA). For many years, the agreed-upon collective bargaining format between the union and the members of the Bell System was to select two Bell System companies with early contract expiration dates as the pattern-setters, one of them being an operating company with a bargaining unit of limited geographic scope, and the other being a bargaining unit with nationwide scope. National issues were the subject of bargaining in these pattern-setting negotiations, while local issues were to be negotiated separately with each unit. Once a pattern-making settlement was reached on a national basis, it became the standard for the settlement of national issues in all the other companies. Bargaining of local issues could then be concluded and complete contracts would be obtained.

In 1971, the pattern-setters chosen by CWA were Weco, as the nationwide bargaining unit, and the Chesapeake & Potomac Telephone Company, a multi-state bargaining unit of limited geographical scope. On April 30, 1971, the contracts with the two pattern-setters were due to expire. No agreement having been reached, the two contracts were thereafter mutually extended on a day-by-day basis to July 14, 1971, as were other contracts with the Bell System that expired between April 30th and July 14th. On July 14, CWA began a nationwide

1. A person laid off must wait basically one week before applying for benefits. A striker waits eight weeks.

strike against the Bell System involving some 500,000 employees, some whose contracts had expired, and some whose contracts, such as employees of Telco, Empire and Long Lines, had not yet expired. Four days later, agreements were reached among Bell System companies, including plaintiffs and CWA. These agreements covered both national and local items, the national items conforming to the national pattern. As soon as the agreements were reached, CWA called an end to the strike and directed a return to work on July 21st. With the single exception of the New York State bargaining units, the CWA-represented employees complied with this direction. However, approximately 38,000 members of the Telco unit continued on strike. Weco and Long Lines employees in New York State similarly stayed off the job. A ratification vote was scheduled and counting of the ballots was set for August 14th. CWA strongly endorsed ratification, and this was joined in by one Morton Bahr who, before, during and after the strike, was the top New York State CWA official. The results of the August 14th voting were that every CWA bargaining unit ratified the contract with the exception of the New York State units for Telco and Empire, and the strike was continued in New York.[2]

At the beginning of the strike, Telco made a decision not to settle, despite the prospect of a long strike, because the company had made an offer which had been approved and recommended by the international union, and which was in line with the pattern settlements ratified by the CWA membership throughout the rest of the country. Telco felt that the New York employees' tactics—endeavoring to break the pattern—could only lead to labor turmoil throughout the Bell System. After a number of months had passed, however, Telco saw that the strike would not end without some concession to union demands and, noting that employees were still eligible for six or more months of unemployment compensation, decided to settle along the lines recommended by the federal mediator. In addition to the fact that unemployment insurance payments would continue, there was pressure from the business community to restore normal operations and make backlogged installations of new equipment. Telco's New York unemployment insurance account was approaching a negative balance, having dropped from a pre-strike credit of more than $40,000,000. Finally, some businesses, in addition to complaining about lack of service, would have had to share in the cost of paying strike benefits if Telco's unemployment insurance fund went into negative balance. These factors caused Telco to submit to a break in the national pattern.[3]

During the seven months of the strike, the striking workers, after their wait of eight weeks, had received $49,000,000 in unemployment compensation benefits which were charged against Telco. Telco's unemployment compensation fund had been depleted by $40,000,000, which it was required to replace.[4] I note that the strike was thereafter declared illegal by the National Labor Relations Board.[5]

■ Notwithstanding the State's adamant position to the contrary, I regard it as a fundamental truism that the availability

---

**2.** Rhode Island (the only other state whose unemployment insurance statute parallels New York's law) employees represented by CWA were but a small part of two bargaining units within the New England Bell Telephone Company and, if they voted to reject their contracts, were obviously outvoted by the remainder of the employees in each of those two units who were employed in states which did not pay unemployment insurance benefits to strikers.

**3.** Notwithstanding the break in the pattern (and, I note, the enormous cost to all parties and the public as well), CWA officer Morton

Bahr, writing after the strike, obviously had mixed feelings about the outcome, for he stated:

"The amount of additional wage benefits is anything but impressive. However, it broke the [Bell] System's long standing policy . . . . So, while the amount of money was small, the accomplishment and impact on the future is significant."

**4.** It was assessed and had paid $6,000,000 in 1974 and $9,000,000 in 1975.

**5.** 208 N.L.R.B. 267 (1973).

to, or expectation or receipt of a substantial weekly tax-free payment of money[6] by, a striker is a substantial factor affecting his willingness to go on strike or, once on strike, to remain on strike, in the pursuit of desired goals.[7] This being a truism, one therefore would expect to find confirmation of it everywhere. One does.

Turning first to the union's contemporaneous view of the effect unemployment insurance had upon its ability to maintain this strike, particularly appropriate is a letter written by Morton Bahr, Vice President of CWA charged with administering all the union's affairs in New York, New Jersey and New England. He wrote to the New York CWA employees shortly after the strike was over:

"The fact that more than 80% of the membership stood together for 218 days is simply incredible. In my judgment, it is a testimonial to three phenomena:

1. Dedication and support by the strikers
2. Unemployment insurance
3. Effectiveness of CWA's defense fund."[8]

During the course of the strike, the following appeared in the *New York Generator*, a CWA newspaper:

"In an attempt to undermine any future strike effort, New York Telephone has filed a suit in Manhattan Federal Court to prevent strikers from collecting unemployment benefits.

\* \* \* \* \* \*

"New York Tel. would do well to pay the [unemployment insurance] fund what it owes and commence preparation for our next contract, and incidentally, better wages and benefits, instead of looking for ways to sabotage our strike weapon even before we utilize it."

In November 1971, during the course of the strike, Bahr wrote a letter to the local president in which he declared:

"The strike against the New York Telephone Company enters the 18th week today. The stamina and spirit of our members in New York Tel and those respecting picket lines in Western Electric and Long Lines, is simply amazing. More than 89% of the New York Plant employees are still on the bricks.

*"New York State Unemployment Compensation is a tremendous assist to our members.* In addition, the CWA Defense Fund is taking care of the necessary payments for shelter and installment payments for cars and appliances where repossession is threatened." [Emphasis supplied.]

In December 1971, CWA Local 1102 in a recorded telephone message issued a threat to a legislator who proposed repeal of the law granting unemployment insurance to strikers. The message, as monitored, read in part as follows:

"According to the Staten Island Advance on Friday, December 3rd, our councilman Frank Deondelulo introduced a resolution which asks the State Legislature to repeal the law enabling strikers to obtain unemployment insurance. This ex-dentist who finds he has all the qualifications for public office is certainly alienating labor and will find this out when he tries for reelection."

At the outset of the strike, CWA expended monies from its own defense fund but shortly thereafter stated:

"No food assistance is to be given after September 7, 1971 since the members will have other income—which will average

6. The average here was $75.00; the highest $95.00.

7. I note that even as to welfare payments, for which one on strike must make a showing of "need," Justice Blackmun, in *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) stated:

"It cannot be doubted that the availability of state welfare assistance for striking work-

ers in New Jersey pervades every work stoppage, affects every existing collective-bargaining agreement, and is a factor lurking in the background of every incipient labor contract." *Id.* at 124, 94 S.Ct. at 1699.

8. Mr. Bahr testified before me some four years after writing this letter that it had other than its plain meaning. I reject that self-serving explanation made at the trial.

$75.00 per week from the New York State Unemployment Compensation."

Following the strike, in April 1973, in a recorded telephone message to its members, CWA Local 1103 in Westchester urged them to write to a local state legislator, saying:

"If we did not get [unemployment insurance] aid during the big strike of 1971 and 1972, I don't know where we would be right now."

Nor is there any question that CWA has always regarded money, regardless of source, as essential to success in a strike. In stating why it had established its defense fund, CWA stated in its Report of the Defense Fund Committee in 1952:

"It was recognized that, regardless of every other consideration, the Union could not hope to survive unhurt in time of stress without an adequate defense fund.

"The experience of every union that has ever joined battle with its bargaining adversary in a show of economic strength proves that a war chest, under one name or another, is an absolute must.

\* \* \* \* \* \*

"The Defense Fund is a tool. It is one of the bargaining tools, similar to such a bargaining tool as statistics which are gathered by the Research Department, and it cannot do a job unless it is held in the proper hands."

CWA further enunciated this view of the importance of money in a strike in an issue of CWA News just before the strike in this case. The article, "Strike Survival," posed the question, "How do you survive a strike when the money stops coming in and the bills continue to mount and you still have to feed and clothe the children?"

While I need not place weight upon the following in reaching my conclusion, it is appropriate to note further support for the truth of the premise in union comment in other strike situations. In the Rochester Telephone Company strike in 1974–1975, CWA Local 1170 exhorted its members by way of a recorded telephone message as follows:

"[T]he members of Local 1170, C.W.A., will march ten feet tall right through the holiday season and into unemployment insurance."

In a 1960 strike involving the United Steelworkers of America, the union answered strikers' questions concerning when they could "start drawing unemployment insurance" by advertising in a Syracuse newspaper that "in just 18 days, you will all be eligible for unemployment insurance."

In an International Union of Electrical Workers meeting in Cleveland, Ohio, at the taking of a vote to end a nationwide strike involving General Electric, the union official chairing the meeting stated as follows: [9]

"All I know is that Schenectady [New York] voted today 5 to 3 to stay out and you know the reason why.

\* \* \* \* \* \*

"Because they're getting $65 a week in unemployment compensation."

During the same General Electric strike, the following appeared in December 1969 in a Schenectady newspaper:

"WORKERS FOREGO STRIKE BENEFITS

"SCHENECTADY (UPI)—Members of one of the largest union locals in the General Electric Co. strike voted Monday to transfer their strike benefits to workers in other states while they collect New York unemployment checks, according to union officials.

"Joseph Mangino, business agent for the 12,500 members of Local 301, International Union of Electric Workers, said the 'solidarity' vote came at an 'overflow' local meeting as the GE strike entered its eighth week.

"Because the strikers in New York State are now eligible for state unemployment payments, Mangino said, they voted to send the $12 weekly per man in union strike benefits to strikers in other states

9. The evidence of this was a motion picture film received and exhibited on the trial.

who do not receive unemployment checks."

Looking further, one continues to discover facts in conformity with the premised truism. Plaintiffs, following the suggestions in *Grinnell Corp. v. Hackett*, 475 F.2d 449 (1st Cir.), *cert. denied*, 414 U.S. 858, 879, 94 S.Ct. 59, 164, 38 L.Ed.2d 108, 124 (1973), engaged Dr. Gerald J. Glasser to do an attitudinal survey.[10] Dr. Glasser, experienced in his field, testified that:

"[A]ttitudes reflect prospective behavior of individuals . . . .

"[T]he attitudes of a group of individuals, like employees, is of some interest and concern to other people, in this particular case, management and labor leaders. So it is important to know attitudes and opinions here for their impact on third parties . . . ."

Dr. Glasser's attitudinal survey, professionally done, was indeed helpful. It was based on random digit dialing and covered 600 union members and 600 non-union members. The results showed a predominant feeling among both union and non-union workers that because of unemployment insurance in New York State unions can achieve better strike settlements, since unemployment insurance enables strikers to hold out longer. Less predominant, but still shared by one-half of the union and non-union workers who expressed an opinion, was the strong belief that unemployment insurance forced management to settle more quickly. A majority of the union members surveyed ranked unemployment compensation as the first resource they would turn to in a strike, above welfare, food stamps and their union's own strike funds.

Plaintiffs, in further accordance with *Grinnell*,[11] proffered Dr. Lewis J. Perl, who had done a statistical comparison using the United States Bureau of Labor Statistics figures for the ten year period from 1965 through 1974 to test the hypothesis that the payment of unemployment compensation to strikers influences the collective bargaining process by increasing the *number* of strikes settled within eight weeks and the *duration* of strikes that continued beyond that period. Dr. Perl's hypothesis was grounded in the belief that compensation influences both parties to the collective bargaining process but in opposite directions. In his view, payment of benefits reduces the cost to workers of strikes lasting more than eight weeks, with the consequence that they are somewhat more aggressive than they would be in their demands and able to tolerate a longer strike. On the other hand, Dr. Perl hypothesized that the payment of these benefits increases the cost to employers when a strike goes beyond the eight week period, not only because of the increased cost of the unemployment insurance taxes themselves, but also because the employer is likely to anticipate an increase in the resistivity of his employees and therefore conclude that if the strike does last more than eight weeks, then he will either have to tolerate a very long strike or settle on terms less favorable to himself than originally contemplated. Thus, an employer would be less willing to see a strike occur in the first place, would be particularly anxious to prevent a strike from lasting more than eight weeks, and might increase settlement offers to avoid either possibility. In sum, therefore, Perl hypothesized that

10. *Grinnell* suggests that:

"[A] . . . representative and sophisticated sampling of experience and attitude directed at the effect of the actual or expected receipt of delayed unemployment benefits might be helpful to a court seeking to decide the relevant question of infringement." 475 F.2d at 459.

11. *Grinnell* called for:

". . . statistical comparisons of the length and cost of strikes in states granting unemployment benefits (Rhode Island and New York) and the length and cost of strikes of

similar size in similar industries in other states not granting such benefits. . . . Their weight would depend on the extent to which they considered and controlled for other factors potentially responsible for any disparities— such as the size and nature of the industry, length and strength of union representation, past labor-management relations and prior strike history, the relative wage and benefit structure under the expiring agreement, and local cost-of-living or other economic or structural peculiarities." 475 F.2d at 459.

one might expect the statistics to show an increase in New York in the proportion of strikes settled in the initial eight week period, on the one hand, and an increase in the duration of strikes lasting longer than that on the other. Perl's hypothesis was indeed supported.

Perl's analysis of the Department of Labor statistics reveals that strikes of more than eight weeks last two to four weeks longer in New York State than in states other than New York and Rhode Island,[12] while a greater percentage of strikes are settled in eight weeks or less in New York than in states other than New York and Rhode Island. Applying the settlement rate for the rest of the country to New York State, Perl concluded that 933,000 fewer man-days would be lost in New York each year were the national settlement rate to prevail here, which would constitute a 15% reduction in man-days lost due to strikes in New York.

Finally, plaintiffs called Dr. Jules Backman, an acknowledged expert in the field of collective bargaining, to give an overview. Backman, too, saw the availability and payment of unemployment insurance benefits as affecting the duration of strikes in opposite directions. Under some circumstances, he felt, the awareness that the staying power of the union would be increased, while at the same time anticipating a rise in their unemployment insurance tax, would induce some employers to settle earlier, out of concern for what may happen after the eight week suspension period. Thus, he concluded, unemployment insurance could increase somewhat the incidence of earlier settlements. However, as the strike passed the eighth week, he saw the position becoming "dramatically one-sided," for (1) the employee comes into receipt of funds adequate or almost adequate to meet essential needs, thereby increasing staying power, (2) the union's willingness to make concessions is reduced because one of its duties, providing resources to meet the needs of strikers, has been met and will continue to be met for as much as a year, and (3) the employer, on the other hand, sees his striking employee being subsidized while he, the employer, is in effect financing the subsidy out of his unemployment insurance taxes.

The State called several expert witnesses in an endeavor to dispute the "truism." The essence of these witnesses' testimony was that (a) it is issues that are in dispute between the parties that cause strikes; unemployment compensation is not a factor in determining whether to strike or maintain a strike once it is underway; and (b) in any event, plaintiffs have not proved that it *was* a factor. Often, in the course of their testimony, however, they ended up supporting plaintiffs' position.[13] To the extent

12. In order to utilize the statistics effectively, Perl lumped New York and Rhode Island—the two states having essentially identical statutes —together. The data for Rhode Island showed no statistically significant differences from the data elsewhere, but the small number of observations available from the Rhode Island data made it impossible to draw any conclusions therefrom with any confidence. In addition, it is clear that where regional or nationwide strikes are involved, any determination as to Rhode Island is frequently made by the larger part of the bargaining unit that is in other states (see *supra* note 2) and, in any event, Rhode Island's small population tends to diminish the statistical value of its own figures.

13. For example, Dr. Mason Haire testified:
"THE COURT: How would you assess that factor, Doctor?
"A. If management thinks the payment of unemployment insurance will enable the workers to hold out longer, how would I assess that factor? Is that the question?
"THE COURT: In their bargaining stance.
"THE WITNESS: If management is convinced that that is true, I think they might change their bargaining position. Whether or not it is true—I think it is characteristic of all of us, if we think something is true, we think there is a burglar under the bed."
Dr. James Kuhn testified:
"Q. [N]ow I want to ask you a question, Dr. Kuhn: If a union believes that strike power is enhanced by unemployment insurance, and so expresses itself, in your opinion, if they believe that, is unemployment insurance exerting some influence in the bargaining situation?
"A. I do not see how one can say, Mr. Benetar, unless you know the influence of other factors, because this psychological factor may be offset by others.

their testimony was in real or apparent conflict, I reject it.

While immaterial to the conclusions reached herein, I deem it appropriate to comment on the claimed interest of the State of New York in paying unemployment insurance benefits to strikers, which proof was offered by the State. Dr. Herman Gray testified that he had been a member of the Legislative Advisory Committee in 1934–1935, assisting in drafting the State's Unemployment Insurance Law. He thereafter served as Chairman and as public member of the State's Unemployment Insurance Advisory Committee. His professional activities over the years were mainly in the capacity of teacher, arbitrator and lawyer. It was his testimony that while the drafters of the law were principally concerned with "involuntary unemployment, and a man who is on strike cannot be said to be involuntarily unemployed," there were other concerns as well. One was with the ability of future administrators, at that time (1935) viewed as being too unschooled in the complexity of labor disputes, to determine whether a labor dispute involved a strike or lockout or whether a particular claimant was a striker, locked-out employee, sympathy striker refusing to cross a picket line, or otherwise affected by the dispute.[14] The result of this concern for efficiency in administration was a compromise under which all employees who became so unemployed were to be lumped together and treated alike and all such claimants were to serve an identical (10 weeks) waiting period and thereafter all were to receive full benefits. Thus, the avowed purpose of the New York Labor Law[15] was subverted for the purpose of mere administrative convenience. Dr. Gray

"Q. I didn't ask you to weight the factors. I understand there is more than one factor in bargaining.
"THE COURT: Well, I think Dr. Kuhn has said yes, it's a question of what happens to that factor, that is all he's saying. He says yes, it is a factor. All right."

14. It was also felt at that time that this would be an insignificant problem.

15. § 501 provides in pertinent part:

regretted this result later when, as the Chairman of the New York State Unemployment Advisory Committee, he wrote in 1946, recommending that benefits *not* be paid to strikers, as follows:[16]

"The present provision of the law which permits the workers who voluntarily become unemployed because of a strike to receive benefits during the pendency of the strike runs counter to the objective of the law which 'compels our setting aside of financial reserves for the benefit of persons unemployed through no fault of their own.'"

Gray concluded his testimony before me with the concession that in his judgment unemployment insurance does have an impact on strikes.

"Q. . . . 'Unemployment insurance benefits as such [Gray had written in 1946] should not be used as an instrument for either party involved in a labor dispute.'
"A. Right. You show me how to avoid it. If I knew a way of avoiding it, I would have proposed it a long time ago."

The other witness called by the State on this subject was Unemployment Insurance Director Harold Kasper, currently Director of New York State Unemployment Insurance Division. Kasper contended that in his opinion the State maintained a neutral position for somewhere between 8 and 11 weeks (depending upon the length of administrative delay in commencement of benefits), saying:

"The State has assumed a neutrality for eight weeks and stood aside, so to speak, hands off, because it has been our experience that most strikes have been settled in that time."

" . . . the legislature therefore declares that in its considered judgment the public good and the well-being of the wage earners of this state require the enactment of this measure for the compulsory setting aside of financial reserves *for the benefit of persons unemployed through no fault of their own.*" (Emphasis supplied).

16. Gray noted $2.5 million in benefits paid to 51,000 strikers in 1946 alone.

Thereafter, Kasper testified, the State intervenes to aid strikers [17] through benefit payments chargeable against their struck employer. Kasper noted that as for the law's requirement that the striker seek other employment for entitlement of benefits, he conceded that little effort is made by the State to enforce this requirement, stating that, in his opinion, part of the objective of the law is to keep an employer's labor force intact during a strike.

Kasper's testimony concerning the actual operation of the law confirmed the conclusion that, certainly today, it is administrative *convenience* and not administrative *inability* that is being offered here by defendants as a justification for the New York approach. Kasper testified in detail on the elaborate quasi-judicial hearing procedure, established and operating under the New York law, which provides for hearings before full-time impartial referees (all of whom are attorneys) in which claimants may be represented by counsel and witnesses are examined and cross-examined under oath. A verbatim stenographic record is produced, briefs may be submitted and appeals as of right may be taken, first to a five member Appeal Board and thereafter to the state courts. As noted by Kasper, Unemployment Insurance Referees are sometimes called upon to resolve subtle and hotly contested questions of fact (e. g., whether an employee has been discharged because of his race). Moreover, administrative *ability* does exist, for 48 states have statutes, some in being as long as New York's, under which determinations as to type of labor dispute and/or status of the claimant are regularly made, as Dr. Gray, one of the New York statute drafters, now recognizes.

Being confirmed in my judgment that unemployment compensation *does* have an impact on strikes, and concluding that the State's interest in its payment is not of such consequence as to be a factor in the Court's determination here, I turn to what I regard as the only issue before me at this time—that is, whether the New York State Labor Law, to the extent it provides for payment of unemployment compensation to strikers, is in conflict, directly or indirectly, with the policy of free collective bargaining established in the federal labor laws and is therefore invalid under the supremacy clause of the United States Constitution.[18]

The principle of labor law preemption "was born of [the Supreme] Court's efforts, without the aid of explicit congressional guidance, to delimit state and federal judicial authority over labor disputes . . . ." *Amalgamated Association of Street Employees v. Lockridge*, 403 U.S. 274, 286, 91 S.Ct. 1909, 1918, 29 L.Ed.2d 473 (1971). Congress has regulated and occupied the area of labor relations "to the full extent of its constitutional power under the Commerce Clause." *Amalgamated Association of Street Employees v. Wisconsin Employment Relations Board*, 340 U.S. 383, 391, 71 S.Ct. 359, 363, 95 L.Ed. 364, (1951). The primary factor which led Congress to enact

"a comprehensive national labor law . . . was the perceived incapacity of commonlaw courts and state legislatures, acting alone, to provide an informed and coherent basis for stabilizing labor relations conflict and for equitably and delicately structuring *the balance of power among competing forces* so as to further the common good." *Lockridge*, 403 U.S. at 286, 91 S.Ct. at 1917–1918 (emphasis supplied).

This view has been most recently reaffirmed in *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418

---

17. "Q. . . . an objective of the statute is to aid strikers to pay their essential expenses when the strike exceeds eight weeks?

"A. Yes . . . .

"Q. You say that one of the objectives was to maintain a labor force for employers, is that right?

"A. That is correct."

18. U.S.Const. art. VI, cl. 2, provides: "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding."

(1975); *accord, Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Beasley v. Food Fair, Inc.,* 416 U.S. 653, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974).

Free collective bargaining, under federal labor policy, is premised on the concept of government non-interference and neutrality. While the government "acts to oversee and referee the process of collective bargaining," it leaves "the results of the contest to the bargaining strengths of the parties." *H. K. Porter Co. v. NLRB,* 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970). The right to bargain collectively clearly contemplates economic warfare and "does not entail any 'right' to insist on one's position free from economic disadvantage." *American Ship Building Co. v. NLRB,* 380 U.S. 300, 309, 85 S.Ct. 955, 962, 13 L.Ed.2d 855 (1965). As a practical matter, the use or availability of economic force was intended to be a factor in reaching agreement in collective bargaining. In *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 489, 80 S.Ct. 419, 427, 4 L.Ed.2d 454 (1960), the Court stated:

"The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized. Abstract logical analysis might find inconsistency between the command of the statute to negotiate toward an agreement in good faith and the legitimacy of the use of economic weapons . . . to induce one party to come to the terms desired by the other. But the truth of the matter is that at the present statutory stage of our national labor relations policy, the two factors—necessity for good-faith bargain-

ing between parties, and the availability of economic pressure devices to each to make the other party incline to agree on one's terms—exist side by side. One writer recognizes this by describing economic force as 'a prime motive power for agreements in free collective bargaining.' " (Citations omitted).

This position was reiterated in *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 288, 92 S.Ct. 1571, 1582, 32 L.Ed.2d 61 (1972), where the Court stated that:

"The congressional policy manifest in the Act [NLRA] is . . . to allow the balance of bargaining advantage to be set by economic power realities."

In *Teamsters Local 20 v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), the Court, in passing upon Ohio common law governing secondary pressures during a labor dispute, an area not specifically covered by federal enactment, also held the field to be preempted.[19]

The clear teaching of the foregoing is that any state activity that "creates a substantial risk of conflict with policies central to federal labor law" is preempted and barred.[20] The New York Unemployment Insurance Law, as applicable to strikers, is just such state activity.

Supportive of this conclusion are reported decisions involving attacks on other state enactments providing for unemployment compensation payments to strikers. In *Grinnell Corp. v. Hackett,* 475 F.2d 449 (1st Cir. 1973), *cert. denied,* 414 U.S. 858, 879, 94 S.Ct. 59, 164, 38 L.Ed.2d 108, 124 (1973), the court reversed the dismissal of the complaint which had alleged the unconstitutionality of Rhode Island's statute. In *Hawaiian Telephone Co. v. Hawaii Dept. of Labor,*

---

19. "If the Ohio law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe . . . the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy. 'For a state to impinge on the area of labor combat designed

to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.' " *Morton,* 377 U.S. at 259–60, 84 S.Ct. at 1258, *quoting Garner v. Teamsters Union,* 346 U.S. 485, 500, 74 S.Ct. 161, 98 L.Ed. 228 (1953).

20. *Connell,* 421 U.S. at 636, 95 S.Ct. at 1841.

405 F.Supp. 275 (D. Hawaii 1975), the court found federal preemption after a trial on the merits. In *Dow Chemical Co. v. Taylor,* 57 F.R.D. 105 (E.D.Mich.1972), motion to dismiss the complaint was denied.

The State, in urging an absence of preemption, directs my attention to cases involving welfare payments to strikers and their families. Principal among these is *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). However, the problems sought to be remedied by unemployment compensation and welfare, and therefore the state's interests, are not identical. As aptly expressed in *Grinnell,* 475 F.2d at 459–60:

> "Welfare payments, premised on a finding of need, are directed at alleviating real hardship—serious threats to the physical well-being, indeed in some cases, survival, of individuals. Unemployment benefits, in contrast, are conditioned on a certain minimal amount of prior employment and earnings in a specified period . . . . The amount of assets on hand or the nature of individual or family need are irrelevant. The state interest would then appear to be . . . the avoidance of 'economic insecurity,' or put another way, insurance against the temporary disruption of a flow of income. "Indeed, as to unemployment compensation for strikers, the state interest would appear somewhat narrower."

Given the foregoing observations, the welfare cases are clearly distinguishable.[21]

Both the State and the plaintiffs direct my attention to the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.,* but obviously for different reasons. The Railroad Unemployment Insurance Act grants benefits to strikers unless the Railroad Retirement Board finds that the strike was commenced in violation of the Railway Labor Act or of the established rules and practices of a bona fide labor organization, of which the striker is a member. From this, the State urges that obviously Congress recognizes that the *prospect* of unemployment compensation is not a factor in collective bargaining and, by analogy, the same Congressional attitude should be applied to the claimed conflict between the NLRA and New York Unemployment Insurance provisions. The plaintiffs, on the other hand, urge the conclusion that when Congress intended to permit compensation to strikers, it specifically provided for it and did so only in a unique situation[22] where elaborate statutory machinery provides for substantial government intervention in the *entire* strike process, including mediation, arbitration and the confirmation of emergency boards, rather than the free collective bargaining envisioned by the NLRA. Unemployment benefits are therefore paid to striking railway employees only after following *all* of the mandated procedures. Otherwise, no benefits are paid (45 U.S.C. § 354). Given the clear teaching of numerous authorities such as *Teamsters Local 20 v. Morton, supra,* I do not draw the conclusion from the unique railroad field that the State urges, and find the analogy inapplicable.

Subsequent to the taking of testimony herein, the United States Supreme Court, in a summary disposition, dismissed the appeal in *Kimbell, Inc. v. Employment Security Commission,* 429 U.S. 804, 97 S.Ct. 36, 50 L.Ed.2d 64 (1976), "for want of a substantial federal question." *Kimbell* involved post-strike payment of unemployment compensation to strikers in certain cases. The State urges that this ruling is not limited to the New Mexico statutory provisions, but is applicable to *any* state statute which authorizes payment of compensation to strikers.

**21.** I note that whereas *Grinnell* suggests that the court should engage in a balancing of federal and state interests, the court in *Hawaiian Telephone Co.* rejected a balancing test, stating that the court's duty was merely to inquire as to whether there was a conflict between the statutes. I conclude I need not reach the question of whether a balancing test is required. However, even if such a test were required, I would hold the federal interest superior to the state interest herein, which is at best one of administrative convenience.

**22.** Obviously, a major railroad strike can have a far greater effect on the nation's economic health than any industrial strike, no matter how large.

*Kimbell,* it is urged, has determined that such payments are not prohibited as being in conflict with federal labor law policy. If the State is correct in this view, *Kimbell* is dispositive of this case.

The New Mexico statute at issue in *Kimbell* provides for the granting of unemployment benefits to strikers only in extremely limited and unusual circumstances which are determined after the strike is terminated,[23] N.M. Unemployment Compensation Law of 1936, § 59–9–5(d), N.M.Stat.Ann. (Supp.1975). The striker-claimants in *Kimbell,* subsequent to the strike, applied for and received unemployment compensation from the New Mexico Employment Security Commission. An appeal was taken to the New Mexico District Court for the Second Judicial District, which entered an order denying the payment of unemployment compensation. The district court concluded that the claimants had been involved in a labor dispute at their last place of employment and that a "stoppage of work," which would disqualify them from benefits under New Mexico's statutory scheme, had occurred as a result of labor dispute. The court also found that:

"Under the facts of this case payment of unemployment compensation benefits to the claimants herein would interfere with the national policy of Federal Labor Law of encouraging self organization and collective bargaining without state interference in the use of economic weapons available to both labor and management, including the policies enunciated in 29 U.S.C. §§ 157–158, on contravention of the Supremacy Clause of Article VI of the Constitution of the United States." *Kimbell, Inc. v. Employment Security Commission of the State of New Mexico,* Consolidated Case No. 6–73–08568, p. 9 of Findings of Fact and Conclusions of Law (N.M.Dist. Ct., Second Dist., filed October 11, 1974).

The New Mexico Supreme Court, in an unreported decision, summarily reversed the lower court on the basis of its decision in *Albuquerque-Phoenix Express, Inc. v. Employment Security Commission,* 88 N.M. 596, 544 P.2d 1161 (1975). *Kimbell, Inc. v. Employment Security Commission of New Mexico,* No. 10323, (N.M.Sup.Ct. Dec. 29, 1975).

*Albuquerque* had upheld the grant of unemployment compensation to strikers after finding that the claimants were available for and were actively seeking work as required by § 59–9–4(a)(3), N.M.Stat.Ann. 1953 Comp.; that they had not left work voluntarily within the meaning of § 59–9–5(a), N.M.Stat.Ann.1953 Comp. and that there was no "stoppage of work" at the company's premises which would disqualify them under § 59–9–5(d), N.M.Stat.Ann.1953 Comp.

On further appeal, the Supreme Court dismissed in a summary disposition as follows:

"The appeal is dismissed for want of a substantial federal question. Mr. Justice Brennan, Mr. Justice Blackmun and Mr. Justice Stevens would note probable jurisdiction and set the case for oral argument."

■ Clearly, this is a determination on the merits of the case, *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). A federal district court, however, must now determine "what issues had been properly presented . . . and declared by [the Supreme Court] to be without substance." *Id.* at 345 n.14, 95 S.Ct. at 2290. Two courts have already expressed their views in this regard and reached opposite conclusions. The court in *Dow Chemical Co. v. Taylor,* 428 F.Supp. 86 (E.D.Mich. 1977), held that the summary dismissal in *Kimbell* did *not* foreclose it from considering the Michigan compensation statute on the merits. The Third Circuit ruled to the contrary in *Super Tire Engineering Co. v. McCorkle,* 550 F.2d 903 (3rd Cir. 1977), stating:

"We can only conclude that, when the Supreme Court dismissed for want of a

---

**23.** It is substantially different, both on its face, and in its operation, from New York's law which grants benefits to all strikers during the strike after a fixed waiting period.

substantial federal question in *Kimbell,* the necessary predicate for that dismissal was a determination that federal labor policy did not preclude the payment of unemployment compensation to strikers. That determination controls the labor policy aspect of this case."

On independent and careful consideration of the record and numerous briefs before the Supreme Court in *Kimbell,* I am compelled to conclude that the Court merely determined that the New Mexico compensation provisions, as a matter of *fact,* do not come into conflict with Federal labor law policy. I note that while the lower court in New Mexico found federal preemption, the reversal by the New Mexico Supreme Court was a summary reversal citing its prior decision, *Albuquerque-Phoenix Express,* which dealt entirely with state issues—construction of the relevant New Mexico statutes. I further note that the Attorney General of New Mexico moved to dismiss the appeal in the Supreme Court on the ground that the question presented to the Court "does not raise a substantial federal question of preemption sufficient for this Court to take jurisdiction." New Mexico's brief in support of that proposition is illuminating:

" . . . the New Mexico law, like a majority of the States' laws, does not provide for payment of benefits to strikers after a fixed period of disqualification. The general rule under New Mexico law is that claimants are disqualified from receipt of benefits for the duration of their unemployment resulting from a labor dispute which causes a substantial stoppage of work at their place of employment. As indicated in the record, the Employment Security Commission of New Mexico has allowed payment of unemployment compensation benefits to strikers in only three cases in its history, including the two cases discussed in this appeal, and only under facts similar to those present in this case where there has been no appreciable impact from the strike on the employers' continued business operations. In contrast to the Rhode Island law, the interpretation by the New Mexico Supreme Court of the New Mexico unemployment compensation statutes provides no fixed or definite policy of payment of benefits to strikers, nor allows any expectations of such payment upon which employees could reasonably predicate labor dispute strategy. In fact, the interpretation by the New Mexico Supreme Court as to when benefit payments to strikers might be authorized runs directly counter to the employees strike objectives which is to impose as substantial an impact on the employers' business operations as possible to increase his economic burden and persuade him to a satisfactory settlement. To the extent this avowed strike strategy is realized, the eligibility of striking employees for benefits is defeated.

"It is apparent, therefore, that neither the statistical history of payment of benefits to strikers nor the inconsistency between strike objectives and eligibility for benefits is likely to make the administration of the New Mexico unemployment compensation law a factor in labor dispute negotiations or to interfere with federal labor policy. The case on appeal here as well as the *Albuquerque-Phoenix Express* case illustrates this point. In neither case did the Employment Security Commission ever reach a decision on the eligibility of the claimants for benefits until after the labor dispute was settled between the parties and a new contract agreement signed."

Obviously, the factual and legal position of the Attorney General of New Mexico would be a sound and compelling basis for the Supreme Court's summary dismissal on the merits. I find this to be the basis for the ruling and conclude that *Kimbell* is at the very least inapplicable and does not preclude me from reaching the issues in this case on the merits.

■ One point alone remains for discussion. The State contends that under the eleventh amendment to the United States

Constitution[24] it is immune from suit because the damage award here sought would be payable to a private party from the State treasury. The State's position is, however, factually not supported, for the Unemployment Insurance Fund, although established pursuant to statute, exists separate and apart from the State's general funds and treasury, *New York Labor Law* §§ 550, 553. It is a pooled fund, consisting entirely of unemployment insurance contributions by employers and some federal funds. It receives *no* State funds of any kind, and is used solely to pay benefits. Indeed, the State has expressly shielded its treasury from any obligations arising out of the payment of unemployment insurance benefits and/or the administration and operation of the fund. §§ 553, 554. This being so, the State's contention is, in my opinion, without merit. See *Bowen v. Hackett*, 387 F.Supp. 1212 (D.R.I.1975); *cf. Fitzpatrick v. Bitzer*, 519 F.2d 559 (2d Cir. 1975).

■ On the basis of the foregoing, the New York Labor Law, to the extent it provides for the payment of unemployment compensation to strikers is state intervention on behalf of the strikers, causes an employer to finance its own strikers, is in conflict with federal labor law policy and is therefore unconstitutional and void under the supremacy clause of the United States Constitution.

The foregoing constitute my findings of fact and conclusions of law.

The parties are to appear before me on June 1, 1977, at 3:00 P.M., to discuss interim relief to the extent appropriate, and to schedule further steps herein.

So Ordered.

24. U.S.Const. amend. XI provides:
"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."